STATE

v.

Bradley KRYLA.

No. 98–431–C.A.

Supreme Court of Rhode Island.

Dec. 6, 1999.

Virginia McGinn, Aaron L. Weisman, Providence, for plaintiff.

Thomas G. Briody, Providence, Thomas Murray, for defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

This is an appeal by Bradley Kryla (defendant or Kryla), who was found guilty of the brutal murder of Sherry Roy (Roy) in a cemetery in Pawtucket, Rhode Island. In his appeal of a judgment of conviction of first-degree murder, the defendant alleged two errors by the trial justice: the denial of his motion to suppress his videotaped statement to the police and the denial of his motion to pass the case. For the reasons set forth below, we deny the appeal and affirm the conviction.

### Facts and Procedural History

On August 26, 1993, upon information from four informants, the Pawtucket police asked Kryla to come to the police station. There, after being informed of his rights, defendant made a videotaped statement detailing his participation in Roy's death.

On August 31, 1994, Kryla and Derek Brown (Brown) were charged by indictment with the murder of Roy.[1] The cases were severed for trial. Kryla's pretrial motion to suppress his videotaped statement to the police was denied by the trial justice. The videotape was admitted into evidence in edited form; it recorded defendant giving the following account of his participation in the crime.[2]

On the afternoon of August 23, 1993, Kryla was drinking beer and playing video games with a friend in Pawtucket, Rhode Island. That evening, after having consumed three to four 40-ounce beers, Kryla accompanied Brown onto West Avenue, where they met up with Roy, who they said was seeking to buy drugs. The defendant, an admitted drug dealer, agreed to provide her with drugs in return for her engaging in sex. Secretly, Kryla and Brown agreed that they would allow Roy to perform her part of the bargain but then leave her without the drugs or money.

Brown, Kryla, and Roy walked to the Mineral Spring Avenue Cemetery to carry out their agreement. At some point after sexual acts were engaged in by the trio, Brown suggested to Kryla that they had to kill Roy, and defendant agreed. Kryla explained that he and Brown feared that Roy would report the escapade to others. According to defendant, Brown threw the first punch, and Kryla followed suit, kicking Roy. Soon, Roy's face was covered in blood, and she was coughing and moaning on the ground. In the course of the savage beating, Kryla picked up a substantial stick and used it to bash Roy's face. Roy repeatedly tried to climb to her feet, but each time was beaten down by Kryla and Brown. In describing her behavior, Kryla stated, "She's not fighting us. She's just fighting to live, I guess."

---

1. Kryla was seventeen years old when Roy was killed. The Family Court waived jurisdiction under G.L.1956 § 14-1-7.1, and the Superior Court tried him as an adult.

2. Because the trial justice found that the original videotape contained too much of the police officers' "testifying," he directed that the tape be edited to remove such "testimony."

After expressing disbelief and frustration that Roy was still alive, Kryla stated that Brown picked up a seventy-eight and a half pound tombstone and dropped it on her head. Still "fighting to live," Roy attempted to run away from her attackers, but Kryla admitted that he chased after her, carrying the same tombstone, and hit her with it. According to defendant's statement, he had trouble running after her while carrying the massive stone. Finally, Kryla stated that Brown hit Roy with the tombstone one last time, and then the two left her in the cemetery, the tombstone lying across her face. Roy's body was found the following morning. The horrendous physical evidence found at the murder site is described in the record.

Three days after the murder, defendant's father told him that the police were looking for him because he had "borrowed" a funnel from a gas station without paying for it. Later that day, defendant and his girlfriend approached their apartment and observed a police car parked outside the house. Unsure whether the police were looking for him because of the funnel or for other reasons, defendant directed his girlfriend to go on ahead of him to find out what was happening. The officers handcuffed her, placed her in the police car, and drove away. The defendant "waited for the officers to return to the spot" because, he said, he had decided to "get this over."

Then-detective Daun White (White) arrived outside the apartment, driving an unmarked police car, and approached Kryla, asked his name, and inquired whether he would accompany the officer to the station. Kryla responded, "Sure." When defendant arrived at the station, he was seated in a chair at a detective's desk in the presence of a plain clothes detective. At about the same time that defendant was brought into the station, then-Detective Bruce Moreau (Moreau) and Detective Michael Malloy (Malloy) were waiting to speak with a potential witness or suspect, Juan Gibson (Gibson). After the officers spoke with Gibson, Moreau informed his sergeant at the station that he had probable cause to arrest defendant, and defendant subsequently was placed in a holding cell and was read his rights. Additional facts will be presented in discussing the issues on appeal.

The defendant was thereafter tried in Superior Court by a jury that returned a verdict of guilty of murder in the first degree in violation of G.L.1956 § 11–23–1. In his appeal of the judgment of conviction defendant alleged two errors: (1) the trial justice erred in denying defendant's motion to suppress because the statements videotaped at the station were the product of an illegal arrest and were not voluntarily made, and (2) the trial justice erred in denying defendant's motion to pass the case because the justice made improper remarks that incurably prejudiced defendant's right to a fair trial.

### *Motion to Suppress*

The defendant asserted on appeal that he was under arrest at the point in time when White asked him to come to the police station and, moreover, that he was arrested without probable cause. Thus, defendant argued, his videotaped statement was the product of an illegal arrest and, as such, should have been suppressed by the trial justice.

In *State v. Bailey*, 417 A.2d 915 (R.I. 1980), this Court outlined several factors that must be considered when determining whether an arrest or a seizure has occurred, including

> "the extent to which the person's freedom of movement has been curtailed and the degree of force used by the police[,] * * * the belief of a reasonable innocent person in the same circumstances[,] * * * and whether the person had the option of not going with the police * * *." *Id.* at 917–18.

■ In maintaining that a reasonable person in his circumstances would believe that he was not free to refuse White's

request to come to the station, defendant relied on several Rhode Island cases. In one of these cases, we concluded that despite the absence of a defendant's protest and regardless of whether the defendant was requested rather than ordered to go, the officer's act of taking him to the station constituted an arrest. *State v. Dufour*, 99 R.I. 120, 127, 206 A.2d 82, 86 (1965). But unlike the defendants in the cases he cited, defendant here was not the subject of an investigatory seizure. The officers in the case at bar did not hold defendant in the hope that evidence would surface or be discovered to establish probable cause to arrest him. Rather, in this case White was unaware that Kryla was a suspect and merely asked his name and whether he would come to the station to answer some questions.

Without hesitation, defendant drove to the station with White, who drove an unmarked police car. At the station and before Moreau called with Gibson's account, defendant was neither told that he could not leave nor was he placed in a locked room. He admitted that the police had handcuffed his girlfriend when they brought her into the station, but did not handcuff him. Moreover, Kryla's mother had been a volunteer at that same station for about a year and a half prior to his detainment so that the concept of being at a police station was not unfamiliar or necessarily threatening to him.

The defendant went on to argue that he could not use the bathroom facility without a police escort, but he did not point to any evidence of force used by any of the officers, most of whom were not in uniform. A reasonable, innocent person in these circumstances would not, in our opinion, believe he was under arrest. Accordingly, we conclude that Kryla had the option not to go to the station, and his personal freedom apparently was not curtailed while he was there. "Our conclusion that no seizure occurred is not affected by the fact that [the defendant] was not expressly told by the [officers] that [he] was free to de-cline to cooperate with their inquiry, for the voluntariness of [his] responses does not depend upon [his] having been so informed." *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497, 510 (1980).

 Moreover, even if we were to consider defendant's detainment an "arrest," such arrest was amply supported by probable cause. "It is not disputed that the Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed * * * an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343, 349 (1979); *State v. Travis*, 568 A.2d 316, 320 (R.I. 1990); *see also* G.L.1956 § 12–7–4. "Probable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a reasonable person's belief that a crime has been committed and that the person to be arrested has committed the crime." *State v. Jenison*, 442 A.2d 866, 873–74 (R.I.1982). Additionally, probable cause is determined under a flexible "totality-of-the-circumstances" analysis. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983). Importantly, probable cause must be based on more than mere suspicion, *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed.2d 441, 450 (1963), and must not be derived from evidence that a subsequent search might disclose. *State v. Doukales*, 111 R.I. 443, 449, 303 A.2d 769, 772 (1973). Because probable cause is an issue of constitutional magnitude, this Court reviews *de novo* such mixed questions of law and fact in accordance with the dictates of *Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911, 919 (1996); *State v. Campbell*, 691 A.2d 564, 569 (R.I. 1997). Accordingly, we proceed to examine whether defendant's transport to the station constituted an unreasonable seizure in violation of the Fourth Amend-

ment. *Davis v. Mississippi*, 394 U.S. 721, 724–25, 89 S.Ct. 1394, 1396, 22 L.Ed.2d 676, 679 (1969).

In so doing, we note that defendant does not dispute that the Pawtucket police officers had reasonably trustworthy information that a crime had been committed, namely a homicide. We agree with the trial justice's assessment that at the time defendant was brought to the station, the police officers had probable cause to believe that defendant murdered Roy, and such knowledge was independent of any information subsequently offered by Gibson. Before defendant was apprehended, Detectives Moreau and Malloy collected information from three independent sources, four informants in total, all of whom implicated defendant in the crime.

Two days after Roy's body was discovered, Moreau received an unsolicited telephone call from a woman who indicated that she knew who was responsible for Roy's murder and that she knew where he lived. When Moreau and Malloy met with the caller, Moreau recognized her as a "citizen informant" who had provided information to him in the past. She informed the officers that Gibson told her the night before that he had seen defendant leave the cemetery on the night of the murder, after entering it with a female. The informant knew that defendant's name was Brad and that his nickname was "Brizz." She gave the officers a physical description of defendant and said that he lived in the West Avenue section of Pawtucket that was, in fact, the area where defendant's parents resided.

The officers next interviewed two "street people" from the vicinity of the cemetery. When asked whether they knew an individual named Brad who lived in the area, they answered in the affirmative and told the officers that they had heard that he "killed a girl in the cemetery." They led Detectives Moreau and Malloy to defendant's apartment on the second floor of 15 Nickerson Street, where a female who answered the door told the

officers that one Gisele Dolivramento lived in the apartment with her boyfriend, whose name she did not know.

Malloy then followed up by contacting another female informant whom he knew to be associated with Gibson. In the past, she had provided reliable information that led to an arrest. The informant revealed to Malloy that Gibson had told her what had happened and warned her to stay away from defendant because he was "crazy." She also told the detective that defendant was dating someone named Giselle. After directing the officer to 28 West Avenue, Kryla's parents' address, the informant correctly identified the truck owned by Kryla's father. Therefore, in light of this substantial information gathered by the detectives, it is our opinion that probable cause existed at the moment White first approached defendant.

■ The defendant went on to contend that the trial justice committed reversible error in denying defendant's motion to suppress his videotaped statement because, given the totality of the circumstances surrounding his statement, defendant did not knowingly, intelligently and voluntarily waive his right to remain silent. We disagree.

■ "In reviewing a trial justice's denial of a criminal defendant's motion to suppress a confession, we review the justice's factual findings deferentially under a clearly erroneous standard." *State v. Page*, 709 A.2d 1042, 1044 (R.I.1998). The "voluntariness" of a confession is a legal question, however, *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 411 (1985), and just as we do with mixed questions of law and fact, *see ante*, this Court undertakes a *de novo* review of questions of law. *Ornelas*, 517 U.S. at 697, 116 S.Ct. at 1662, 134 L.Ed.2d at 919; *State v. Nardolillo*, 698 A.2d 195, 200 (R.I.1997); *Campbell*, 691 A.2d at 569. "A defendant's confession is only admissible against him if the state can first prove by clear and convincing evidence that the

defendant knowingly * * * and voluntarily waived his constitutional rights expressed in *Miranda v. Arizona.*" *Nardolillo,* 698 A.2d at 200.

Malloy testified that before defendant was brought to the videotaping room, he was advised of his rights. The detective placed the rights form in front of defendant and asked him to place his initials next to every statement to indicate that he understood each one. The defendant initialed all statements and signed the form, and his mother, Rochelle Kryla (Mrs. Kryla), signed as a witness. Before signing the form, Mrs. Kryla was informed that her son's rights applied to her as well. In the room with defendant and his mother when they signed the rights form were Malloy and another detective, whom she knew from her volunteer work for the Pawtucket Police Department.

After the waiver, the detectives questioned defendant for approximately five to ten minutes until the room equipped with a video camera was available; then Moreau, Malloy, Mrs. Kryla and defendant proceeded to the room, where Malloy again informed defendant of his rights. Because defendant preferred not to discuss the details of the crime in his mother's presence, Mrs. Kryla voluntarily left the room.

It is well-settled that "the validity of a juvenile's waiver of his or her rights should be evaluated in light of the totality of the circumstances surrounding that waiver." *Campbell,* 691 A.2d at 567 (quoting *In re Kean,* 520 A.2d 1271, 1276 (R.I. 1987)). Such an evaluation conforms to the directive of the Supreme Court of the United States in *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979). We have observed that

> "the totality-of-the-circumstances test requires consideration of all of the circumstances surrounding the interrogation of a juvenile suspect, including the juvenile's age, experience, education, and intelligence, his or her capacity to understand the *Miranda* warnings and

the consequences of waiver, and the presence of a parent, a guardian, or an interested adult." *Campbell,* 691 A.2d at 567 (citing *In re Kean,* 520 A.2d at 1274–75).

 Here, defendant argued that his lengthy and illegal detention rendered his subsequent waiver involuntary. Having previously determined that the detainment was legal, we shall address only defendant's suggestion that the detention was unduly long. Although it is true that defendant was detained at the station for four hours before giving his statement, the testimony at trial revealed that the delay resulted from defendant's father's delay in locating Mrs. Kryla, who had been out at a party. Moreover, by awaiting her arrival before taking a statement from defendant, the officers were following standard police procedure that afforded more protection to minors.

 The defendant next claimed that the officers promised his mother that he would remain in the juvenile system if he cooperated. Even if defendant thought this was the case, this technique would not necessarily render his statement involuntary. *State v. Marini,* 638 A.2d 507, 513 (R.I.1994). While city law enforcement agents have no authority, absent consent of the Attorney General, to enter into a binding agreement of nonprosecution in return for a defendant's cooperation, *State v. Russell,* 671 A.2d 1222, 1223 (R.I.1996), they are "permitted to tell an accused that his cooperation would be 'helpful' to him." *Marini,* 638 A.2d at 513 (citing & quoting *United States v. Davidson,* 768 F.2d 1266, 1271 (11th Cir.1985)). Moreover, Mrs. Kryla confirmed that she never told her son "one way or the other what he should do." She simply advised him that she had raised him to "always tell the truth." Hence, there is no sufficient promise of reward to vitiate the voluntariness of defendant's confession.

The defendant further alleged that his age and "limited" mental capacity impaired

his ability to voluntarily waive his *Miranda* rights. At the suppression hearing, defense attorneys attempted to portray defendant as a confused adolescent. Mrs. Kryla testified that defendant recently had been diagnosed with attention deficit disorder, and defendant reported that he had quit his job at Burger King because it was too hectic.

 Our review of the record, however, reveals a far different picture of defendant. He was seven months shy of his eighteenth birthday at the time the police took his statement. Although not yet eighteen, he lived with his girlfriend, their infant son, and his sixteen-year-old sister. He had already graduated from high school, could drive a car, and had held a couple of jobs. Moreover, defendant had been arrested prior to this occasion and admitted that he had heard the *Miranda* rights before. From these facts and after viewing defendant's demeanor on the videotape, we conclude that defendant understood and voluntarily waived his right to remain silent. As we have noted, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Campbell*, 691 A.2d at 567 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986) (absent coercive police activity, the mental condition of defendant alone does not render a confession involuntary)). Here, there is absolutely no evidence of any coercive police action. On the contrary, possibly because of his mother's work at the station, defendant was afforded ample consideration.

In sum, we agree with the trial justice, who, in denying the motion to suppress, found that "the defendant was given the constitutional rights, so-called Miranda rights." We likewise concur that defendant "understood these rights and he had seen them before." Accordingly, we affirm the trial justice's finding that defendant was apprised of his rights and, on the basis of the totality of the circumstances surrounding his statement, that he waived his rights knowingly and voluntarily.

### *Motion to Pass the Case*

The defendant's second claim of error is that the trial justice made improper remarks, in the jury's presence, that prejudiced defendant to the extent that a curative instruction could not and did not suffice.

Because defendant admitted his culpability in the murder, his entire defense at trial rested on the doctrine of diminished capacity. Consequently, the credibility of his expert witness, psychologist Reneau Charlene Ufford Kennedy, Ph.D., (Kennedy), was pivotal to his case. When asked whether defendant knew that hitting Roy with the stick might hurt her, Kennedy responded, "I never asked him that but I imagine he would," and when asked whether defendant knew that dropping the tombstone on Roy might hurt her, she answered, "I would imagine he would know that." The prosecutor then asked her opinion of what was "going on in [defendant's] mind," to which Kennedy responded: "[I]n my opinion what is going on in [defendant's] mind at that time is he's in a fight and he's kicking and that's what's going on." In answering the next question on cross-examination, Kennedy stated that, "It's my understanding that it is his intention to harm that individual." Soon thereafter, the following dialogue took place between the prosecutor, Kennedy, the trial justice, and defense attorneys:

"THE COURT: Did he tell you he knew when he dropped a seventy-eight and a half pound tombstone there was going to be serious injury, perhaps death?

"A Your honor, I didn't ask him that question.

"THE COURT: Okay.

"Q You didn't ask him that question?

"A I didn't ask him that question.

"THE COURT: Would you ask him?

"A Yes. I can give you an opinion.

"[DEFENSE COUNSEL]: Objection. Speculation.

"THE COURT: *She's been speculating all the time she's been on the stand.*

"[DEFENSE COUNSEL]: Objection. Objection.

"[DEFENSE CO–COUNSEL]: Judge, may we approach the bench?" (Emphasis added.)

At the sidebar that followed, the trial justice denied defendant's motion to pass the case. Later that day, defendant again moved to pass the case, and the trial justice again denied the motion. The defendant based his second motion to pass the case on the speculation remark as well as on the basis of two other incidents that he contended demonstrated the trial justice's favoritism towards the prosecution, first, when the trial justice did not rebuke the prosecutor for using profanity but rebuked the defense counsel for doing so, and second, when the trial justice belittled defense counsel by warning, "You might [sit while addressing the Court] in the Commonwealth [of Massachusetts] but don't do it here." In his final charge to the jury, the trial justice began with the following caution:

"If, during the course of this trial, either from something I said or some of the actions I made, you feel that I have an opinion as to what your verdict will be, you'd be sadly mistaken. Your verdict is what you find the evidence to be based on the law as I instruct you. I have no right and I never intended to try to influence you from anything I said or anything I did. So, if you feel I did something that signals to you what your verdict should be, please disregard that."

■■■■ It is well settled that a decision to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice. *State v. Figueroa,* 673 A.2d 1084, 1091 (R.I.1996); *State v. Martellini,* 533 A.2d 527, 529 (R.I.1987). The determination of the trial justice in deciding to pass a case is accorded great deference because "he or she possesses a 'front row seat' at the trial and can best determine the effect of the improvident remarks upon the jury." *Figueroa,* 673 A.2d at 1091. (quoting *State v. Tempest,* 651 A.2d 1198, 1200 (R.I.1995)). Therefore, the determination of the trial justice will be given great weight and will not be disturbed unless it is shown to be clearly wrong. *Id.*

■■■■ This Court has long held that an improper comment by the trial justice may warrant a new trial. *State v. Harris,* 89 R.I. 202, 208–09, 152 A.2d 106, 110 (1959). For example, when a judge chooses to comment upon evidence in charging the jury, caution is required to ensure that the comment remains impartial. *State v. Douglas,* 78 R.I. 60, 67, 78 A.2d 850, 853 (1951). Additionally, the judge must not convey to the jury an opinion on the weight to be afforded to any testimony. *Pompei v. Cassetta,* 63 R.I. 74, 77–78, 7 A.2d 198, 200 (1939).

■■■■ In this case, the trial justice stated, "She's been speculating all the time she's been on the stand." It is our opinion that this comment crossed the bounds of impartiality. The remark was unnecessary, unfortunate, and unduly suggestive of the trial justice's impression of the weight to be afforded the testimony of defendant's key witness.

■■■■ Nevertheless, the comment was not sufficiently prejudicial to warrant a mistrial. Even absent the trial justice's troubling remark, Kennedy's testimony was problematic for the defense. Moreover, the two additional incidents cited by the defendant do not meaningfully strengthen his argument. Collectively, the remarks, in our opinion, did not inflame the jury to the degree that the trial justice was required to pass the case. Thus, the trial justice was not clearly wrong and did not abuse his discretion in denying the defendant's motions to pass the case.

In summary, therefore, we deny the appeal and affirm the judgment of the Supe-

rior Court, to which we return the papers in the case.