STATE

v.

**Pedro ORTIZ.**

**No. 2002–81–C.A.**

Supreme Court of Rhode Island.

June 10, 2003.

Virginia M. McGinn/Aaron Weisman, Providence, for Plaintiff.

Paula Rosin, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

A truck driver making an early morning delivery was the first to spot the body. Badly beaten, bruised, and bloodied, it lay in a lifeless heap by the loading-dock area of the Pawtucket Family Market Place. After considering the evidence garnered during a police investigation, a grand jury indicted the defendant, Pedro Ortiz (Ortiz or the defendant), for the second-degree murder of Jose Correa (Correa or the victim). A trial jury then found Ortiz guilty of this crime, and the trial justice sentenced him to serve a term of thirty years.

The defendant raises three issues on appeal. First, the trial justice erred, he suggests, in denying his motion to suppress his custodial statements to the Pawtucket police on the grounds that the police obtained them only after they had arrested him without probable cause to do so. Second, the trial justice committed prejudicial error, he asserts, when he permitted an expert witness from the medical examiner's office (medical examiner) to testify that Correa's blood-alcohol content showed that he was impaired at the time of his death. Third, the trial justice erred, he contends, in refusing to instruct the jury on involuntary manslaughter.

For the reasons summarized in this paragraph and explained below, we reject these arguments and affirm the conviction. Because the police had probable cause to detain and arrest defendant, the trial justice properly denied his motion to sup-

press. Also, the trial justice did not err in admitting the medical examiner's testimony that the victim's blood-alcohol level, which was over three times the legal minimum sufficient to convict a person for driving while intoxicated, indicated that the victim was impaired by alcohol at the time of his death. Lastly, the evidence adduced at trial did not warrant a jury instruction on involuntary manslaughter because, if Ortiz's beating of the victim did not constitute self-defense, then he mauled the victim so viciously and so extensively with a board containing protruding nails that the victim's death could not possibly have been unintentional.

## Facts and Travel

Early on the morning of September 21, 1999, at approximately 7 a.m., truck driver Dennis Desautels (Desautels) was making a regular delivery to the Family Market Place on Barton Street in Pawtucket when he discovered the bloody, badly beaten, and apparently lifeless body of an unidentified man lying on the ground near the loading dock. Desautels got out of the truck to examine the body and to confirm that the victim was indeed dead. As a precautionary measure, however, he also requested certain people in a nearby bakery to call 9–1–1 for emergency assistance. The police responded to the scene within five minutes of this call.

Robert Thurber (Thurber), a lieutenant with the Pawtucket Fire Department Rescue Squad, initially determined that the victim appeared to be dead because the body lacked a pulse or any signs of respiration. Thurber observed blood surrounding the head of the victim and noted that the body was missing a left shoe.

Officer Shawn Driscoll (Officer Driscoll), a police officer for the Pawtucket Police Department, also arrived at the loading-

dock area. Officer Driscoll observed that the victim had suffered severe facial and head injuries and that most of the blood surrounding the head had dried, but that some areas still were wet. Officer Driscoll patrolled the loading-dock area as part of his usual rounds, but he had not noticed a body lying on the ground at about 3 a.m. when he drove near the loading dock. Officer Driscoll's first thought was that defendant, whom he knew to be a homeless man and a frequent visitor to this part of the city, was himself the victim.

Detective Mark Force (Det. Force), a Pawtucket police detective assigned to the identification division, processed the crime scene behind the Family Market Place. Detective Force obtained a thumb print from the victim that the authorities later used to identify the body as that of Correa, another homeless man who also was known to the Pawtucket police. He took photographs of the body and the surrounding environment and videotaped the scene. He noticed blood trailing from the loading-dock area to the victim's head. In a tree about forty feet from Correa's body, he also discovered and seized a two-by-four piece of wood with three nails sticking out of one end (the nail board). It was resting on top of a chain-link fence that separated the loading-dock area from the nearby Amtrak railroad tracks.

Detective David Malkasian (Det. Malkasian) responded to the crime scene at about 8 a.m. After taking it all in, he returned to the police station to brief the police commander. He later returned to the Family Market Place, where he learned that the victim had been identified as Correa, a homeless man who he knew had frequented that location. Detective Malkasian directed other detectives to try and locate known friends and associates of the victim, such as Ortiz. As he was leaving the parking lot onto Barton Street and then turning right onto Dexter Street, Det. Malkasian spotted Ortiz, who he knew to be one of Correa's friends, at the opposite end of the parking lot. Ortiz was approximately 150 yards from Correa's body. He and Det. Lieutenant Clarkson observed Ortiz sitting on a small tree stump, drinking from a bottle in a paper bag, and smoking a cigarette. Detective Malkasian approached Ortiz and asked him to put down his drink and the cigarette and to stand up. After Ortiz complied with that request, the detective noticed small cuts and abrasions on Ortiz's left hand and wrist that appeared to be recent wounds. When the detective also saw what appeared to be dried blood on Ortiz's sneakers, he asked him to turn around so he could get a better view. He then saw what he believed to be blood stains on the rear heel portion of Ortiz's sneakers. As a result, he radioed for a police officer to seize the sneakers as evidence and for a uniform car to transport Ortiz to the police station. Thereafter, the police arrested Ortiz and brought him to the station.

At the station, Detective Gary Grenier (Det. Grenier), the lead investigator, and another detective questioned defendant for about two and a half hours, beginning at around noon. They brought Ortiz to an interrogation room. By this time, he was clad only in a paper "johnny" because the police had seized his clothes as evidence. According to Det. Grenier, after he advised Ortiz of his *Miranda* rights, Ortiz agreed to waive them. He then proceeded to provide the police with an oral recitation that they later caused to be typed into a written statement.

During the interrogation, Ortiz explained to the detectives that he was concerned for Correa's safety because he had heard that some people were looking for him in connection with a robbery. According to Ortiz, he woke Correa to tell him

about this because others were blaming Ortiz for certain robberies when, in fact, it was Correa that was committing them. According to what Ortiz told the detective, Correa reacted angrily upon being awakened. He allegedly seized the nail board and swung it at Ortiz, injuring Ortiz's left wrist. Ortiz said that he wrested the nail board away from Correa and struck him with it. At that point, Ortiz said, he began to walk away when Correa came after him again and grabbed him. Ortiz then struck Correa in the head with the nail board and Correa fell to the ground. Ortiz told the police that he then hit Correa several more times with the nail board before he threw the board over the fence that separated the Family Market Place parking lot from the railroad property. Ortiz said that Correa was still alive when he left the area because he could hear him breathing.

While they were typing up Ortiz's statement, the police gave him a soda and a sandwich. It took the police about two hours to prepare the document containing Ortiz's statement. They then decided to preserve what Ortiz had told them by using a videotape recorder. In front of a camera, the police read the typed statements to Ortiz and asked him whether he agreed with those statements, recording this colloquy on videotape. The entire interrogation took six to seven hours.

The autopsy revealed that Correa died from brain injuries and from skull factures caused by blunt-force trauma and that the manner of his death was homicide. According to the medical examiner who testified at the trial, Correa was five-feet nine-inches tall, weighed 157 pounds,[1] had a blood-alcohol level of 0.309 percent, and a urine-alcohol level of 0.435 percent at the time of the autopsy. The medical examin-

er explained at trial that the victim's blood-alcohol level provided a more accurate reading of Correa's actual level of intoxication at the time of the murder. He also said that although this amount of alcohol in a person of Correa's size "would be a minimal factor in his demise," it would have caused him to be impaired. The medical examiner recounted the multiple lacerations, contusions, and abrasions on the victim's body. He indicated that it was impossible to determine precisely how many times Correa was hit, but given the approximately thirty or so different injuries to his body, the number of blows probably was in the range of four to fifteen:

"[I]t would be unlikely to have a very low number because of the wide distribution of the wounds. There are wounds on the scalp. There are wounds on the lip. There are wounds on the thigh. * * * [S]o the wounds would have to be clustered in certain fields, but it would be impossible to come up with an exact number."

Ortiz testified at his trial and explained that, in September 1999 he was homeless. Like Correa, he sometimes slept at the Family Market Place. Ortiz and his associates survived on money obtained by panhandling. He was friends with Correa for ten to fifteen years, but he said that Correa had a reputation as a violent person. He then provided examples of Correa's previous acts of violence. Correa, he said, once hit him on the head with a big rock because he refused to share his beer with Correa. On another occasion Correa jumped Ortiz and hit him with a crate because Ortiz refused to share his beer with him. Correa also cut Ortiz's leg with a knife on one occasion because Ortiz

1. The defendant at the time of his arrest was five-feet seven-inches tall and weighed 120 pounds.

would not buy him an orange. On another occasion, he saw Correa punch his girlfriend in the face. He even saw Correa attack other homeless people and once saw him inflict what he believed were skull fractures on one of his victims.

On September 21, 1999, the day of the fatal incident, Ortiz testified, he went to talk to Correa because he knew that people were after him. He said that he found Correa sleeping underneath the dumpster behind the Family Market Place. When he woke him, Correa supposedly swung at him with the nail board, striking him on the wrist as he tried to block the blows. After he managed to take the board away from Correa, Ortiz then hit Correa with it because he was afraid Correa would try to kill him.[2] When Ortiz started to walk away to dispose of the board, Correa tried to pull him down. Ortiz then turned toward Correa and struck him again a couple of times with the nail board. Correa fell down. When he tried to get up, Ortiz struck him again with the nail board and then walked away. Ortiz then threw the board away to hide it from Correa because he did not want to get hit with it again. He believed Correa was still alive because, when he left him, he still heard him breathing. Although he did not see a lot of blood because it was very dark, he said that he heard and felt Correa's blood splattering on him. The next day Ortiz changed his bloody pants and went to sleep by a cemetery. Later, he purchased some beer and was sitting under a tree drinking it when the police approached him.

In due course, a grand jury indicted Ortiz on a charge of second-degree murder, as provided in G.L.1956 § 11–23–1. After the trial justice denied defendant's motion to suppress the statements he had provided to the Pawtucket police, a trial jury found Ortiz guilty of this crime and rejected his self-defense theory. The trial justice later denied defendant's motion for new trial and then sentenced him to serve thirty years in jail. Below, we address his arguments on appeal.

I

Motion to Suppress

■ The defendant alleges that the trial justice erred in denying his motion to suppress his post-arrest statements to the police. He admits that the police had probable cause to believe that someone had committed a crime after they found Correa's bludgeoned body in the Family Market Place's loading-dock area. And he does not dispute that the police acted lawfully in approaching him when they found him sitting on a tree stump drinking beer and smoking, just 150 yards or so from the body. He also agrees that the police acted properly in temporarily detaining him because they were in the process of investigating the murder. But, defendant argues, both his oral and videotaped statements to the police should have been suppressed because the police obtained them as a result of arresting him without probable cause to do so. The statements, he suggests, were the direct fruit of his illegal arrest. Thus, he maintains, the trial justice erred in denying his motion to suppress his statements.

■ In reviewing a trial justice's denial of a motion to suppress, we defer to the trial justice's factual findings, to which we apply the "clearly erroneous" standard of review. *State v. Apalakis*, 797 A.2d 440, 443 (R.I.2002). In reviewing a probable-cause-to-arrest determination, however, we

2. The defendant admitted that he never told the police while giving his statement that he was afraid of Correa on the night of the incident.

engage in a *de novo* review of the ultimate conclusion because this type of ruling involves a mixed-law-and-fact analysis that implicates constitutional rights. *State v. Guzman*, 752 A.2d 1, 3 (R.I.2000); see also *State v. Kryla*, 742 A.2d 1178, 1183 (R.I. 1999). Both the Fourth Amendment to the United States Constitution and article 1, section 6, of the Rhode Island Constitution require that before a police officer can arrest a person, he or she must have probable cause to support such a seizure.[3] *State v. Belcourt*, 425 A.2d 1224, 1226 (R.I. 1981).

■ In *Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), the United States Supreme Court held that a police officer may arrest a suspect without a warrant if, before the arrest, the police had probable cause to believe that the suspect had committed a crime. Rhode Island case law indicates that the existence of probable cause at the time of arrest determines its legality. *Guzman*, 752 A.2d at 4–5; *Kryla*, 742 A.2d at 1182–83; *Belcourt*, 425 A.2d at 1227. Thus, in *State v. Frazier*, 421 A.2d 546, 550 (R.I.1980), this Court explained that "[o]ne of the most important elements in determining whether probable cause existed is satisfied when the police know a crime has actually been committed." "[P]robable cause must be based on more than mere suspicion, * * * and must not be derived from evidence that a subsequent search might disclose." *Kryla*, 742 A.2d at 1182.

"The existence of probable cause to arrest without a warrant depends on whether, under the totality of the circumstances, the arresting officer possesses sufficient trustworthy facts and information to warrant a prudent officer in believing that the suspect had committed or was committing an offense." *Guzman*, 752 A.2d at 4; see also *Kryla*, 742 A.2d at 1182; *Belcourt*, 425 A.2d at 1227; *Frazier*, 421 A.2d at 550; *State v. Duffy*, 112 R.I. 276, 279, 308 A.2d 796, 798 (1973).

■ The probable-cause inquiry should focus on the arresting officer's general knowledge and experience, as well as information received by the arresting officer through official channels and via the collective knowledge of the police department. *See Guzman*, 752 A.2d at 4–5 (holding that the arresting officer had probable cause to arrest the defendant because, among other things, the officer knew that a crime had been committed, the defendant's appearance matched the police-radio broadcaster's description, the arrest took place within twenty minutes after the commission of the crime, and the police encountered the suspect within ten to twelve blocks or so from the murder scene); *Kryla*, 742 A.2d at 1183 (holding that probable cause existed to support the arrest because sufficient evidence existed for the police to conclude that someone had committed a homicide and various informants provided the police

**3.** The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Article 1, section 6, of the Rhode Island Constitution provides:

"The right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on complaint in writing, upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched and the persons or things to be seized."

with substantial information implicating the defendant); *Belcourt,* 425 A.2d at 1227 (upholding a finding of probable cause to arrest the defendant based on the crime victims' detailed description of the defendant's physical appearance and clothing, which information the police transmitted to the arresting officer via a police-radio dispatcher); *Duffy,* 112 R.I. at 280–81, 308 A.2d at 799 (holding that, by relying on the police department's information transmitted via a radio message, the arresting officer was justified in stopping, questioning, and arresting the defendants).

 Proof of probable cause to arrest does not require the same degree of proof needed to convict the defendant at trial. *Belcourt,* 425 A.2d at 1226. When considering the existence of probable cause, we deal in probabilities. These probabilities "are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949). Thus, we review "a defendant's assertion that he or she was arrested without probable cause in light of 'the mosaic of facts and circumstances * * * viewed cumulatively "as through the eyes of a reasonable and cautious police officer on the scene, guided by his or her experience and training." ' " *Guzman,* 752 A.2d at 4 (quoting *In re Armand,* 454 A.2d 1216, 1218 (R.I.1983)).

In this case, the trial justice denied defendant's motion to suppress for the following reasons:

"[Ortiz] was known to be an associate of a person who had very recently been killed in a very close proximity to where the defendant was found. The deceased was observed to have been severely battered and to have bled profusely. The defendant is even found to have wounds in the form of cuts and abrasions on or about his left wrist. Given that, this might be a close call. If the defendant's minimal deprivation of liberty at the time had been engaged with conducting a full-fledged arrest, added to the inventory of factors given to make up both articulable suspicion and probable cause at this stage the officers could add at the side what appeared to be blood on the defendant's sneakers, asking the defendant to turn around so they could get a closer look rather than to walk around themselves to look better is minimally intrusive. Now that the officers have made a proper stop in the sense they were minimally intruding on the defendant's liberty was not unreasonable. Once the bloody sneakers were fully revealed to the officers without question what had up to then been articulable suspicion and a close call on probable cause became full blown probable cause. There is no question once the officers had observed the bloodied sneakers more closely they had enough in this [c]ourt's opinion to take the defendant into custody."

 Based upon our review of the record and the totality of the circumstances that existed at the time of the arrest, we are of the opinion that the trial justice properly denied the motion to suppress. The police knew that someone had committed a crime; indeed, they just had found Correa's badly beaten, bruised, and bloodied body within a short distance from where they encountered defendant, who they knew to be one of the victim's close associates. The victim, who was at first unrecognizable because of the severity of the beating, was identified as Correa only through the taking of a thumb print. Detective Malkasian, the crime-scene supervisor, knew that Correa was a homeless man who slept in the Family Market Place

**482**

area. The police also knew that Ortiz, another homeless man, slept in the vicinity of the Family Market Place. After returning to the crime scene, Det. Malkasian observed Ortiz, whom he previously had spotted hanging out with Correa, sitting on a tree stump not more than 150 yards from the body. After approaching Ortiz, Det. Malkasian observed small cuts and abrasions on his left hand and wrist area. The detective asked him to turn around because he also observed blood on his sneakers.[4] During the suppression hearing, Det. Malkasian testified that he "saw some blood on [Ortiz's] sneakers and [he] asked [Ortiz] to turn around, and when [Ortiz] did [he] did in fact see more of what [he] believed to be dried blood on [Ortiz's] sneakers." Later, the police seized Ortiz's sneakers and drove him to the police station. There, he waived his rights and provided the police with an oral and videotaped statement.[5]

We agree with the trial justice that, after the police had observed the bloody sneakers, "what had up to then been articulable suspicion * * * became full blown probable cause," such that the totality of the circumstances warranted taking defendant into custody pending further investigation concerning his role in the murder. Thus, for these reasons, we hold that probable cause existed for the police to detain and arrest Ortiz. As a result, we affirm the trial justice's denial of the motion to suppress defendant's post-arrest statements admitting his involvement in the murder.

4. We agree with the trial justice that the request for defendant to turn around was minimally intrusive.

5. Under the plain view doctrine, the seizure of the sneakers was appropriate. "The plain-view doctrine allows seizure of evidence that is openly on display when an officer, who is lawfully in a position to see the evidence and

## II

### The Medical Examiner's Testimony

■ The defendant's second assignment of error on appeal is that the trial justice erred in overruling his objection to a question the prosecutor posed to the medical examiner concerning Correa's level of alcohol intoxication. During the prosecutor's redirect examination of this witness, the following exchange took place:

"[Question:] You were asked about the alcohol level, .309 in Jose Correa. What would the reflexes of a person with .309 alcohol level be?

"[Defendant:] I object.

"[The Trial Justice:] Sustained.

"[Question:] What would the reflexes of Jose Correa at 157 pounds be like at .309?

"[Defendant:] I object.

"[The Trial Justice:] I can't let him answer the question in the form you are putting it. I'm going to sustain.

"[Question:] At .309, Jose Correa weighing 157 pounds, would he be impaired?

"[Defendant:] I object.

"[The Trial Justice:] Overruled. Witness may answer.

"[Witness:] Yes."

The defendant suggests that the witness should have been required to lay more of a foundation before concluding that Correa's level of alcohol intoxication caused him to be "impaired." He contends that the medical examiner based his opinion about Correa's impairment solely on the reading of

to have lawful access to it, immediately recognizes that the object is evidence of criminality." *State v. Pratt*, 641 A.2d 732, 738 (R.I. 1994). Immediately apparent or recognizable means that probable cause exists to link the property that the police observe in plain view with criminal activity. *Id.*

his blood-alcohol level and nothing more. Consequently, he argues, the prejudice that resulted from the trial justice's error was more than *de minimus*.

It is well established that trial justices possess wide discretion when it comes to admitting expert testimony. *State v. Griffin*, 691 A.2d 556, 558 (R.I. 1997). "As evidentiary gatekeepers they must first be persuaded that sufficient foundational facts have been adduced to remove the expert's proffered opinions from the realm of speculation." *Id.* Nevertheless, a trial justice's ruling "will not be disturbed unless [it is] clearly erroneous." *Id.*

The defendant relies on two cases to support his reasoning: *State v. Johnson*, 667 A.2d 523 (R.I.1995) and *State v. Sanden*, 626 A.2d 194 (R.I.1993). In *Johnson*, we affirmed a trial justice's refusal to offer a jury instruction based on manslaughter by reason of diminished capacity because more fundamental evidence was required to establish the defendant's level of intoxication. *Johnson*, 667 A.2d at 529. This Court also explained in *Sanden* that evidence that the defendant's mother had purchased six beers, that the defendant later consumed all six beers, and that six beer cans were found in the wastebasket was insufficient to establish the extent of the defendant's intoxication. *Sanden*, 626 A.2d at 199. In *Sanden*, we also provided some examples of relevant factors to assist the court in determining a person's level of intoxication: how much alcohol the defendant typically consumed; the defendant's weight; and how much food the defendant ingested before consuming alcohol. *Id.* Yet, in both *Johnson* and *Sanden*, readings of the defendants' actual blood-alcohol levels were not introduced into evidence. And, most importantly, the defendants in those cases were attempting to show that their level of intoxication was such that

they were incapable of forming the requisite intent to commit murder.

In this case, however, the medical examiner testified at trial to the level of alcohol found in the victim's blood and urine based on the autopsy report. He also revealed Correa's weight. The autopsy showed that Correa's blood-alcohol level was 0.309 percent and his urine-alcohol level was 0.435 percent. According to this expert witness, these readings indicated acute intoxication of the victim at the time of the murder. The defendants in both *Johnson* and *Sanden* did not provide any expert testimony about the degree of intoxication, nor did they offer evidence of any blood-alcohol or urine-test results. They simply provided testimony that they had been drinking in the hope of thereby proving their diminished capacity. *Johnson*, 667 A.2d at 529; *Sanden*, 626 A.2d at 199. In this case, however, the issue was not the alleged diminished capacity of defendant, but whether the circumstances of the killing amounted to self-defense, murder, or voluntary manslaughter. The victim's impairment because of his consumption of alcohol was relevant in assessing the credibility of what defendant told the police about his encounter with Ortiz. The medical examiner ascertained the victim's level of intoxication during this encounter by measuring the alcohol content in his blood and by performing a urine test. He also indicated that, if alcohol was a contributing cause of Correa's death, it would have been only a minimal factor.

In *State v. Nazario*, 694 A.2d 666, 668 (R.I.1997), we affirmed the defendant's conviction even though the trial justice allowed the defendant to introduce evidence of the decedent's "blood-alcohol level and its probable effect upon his degree of intoxication," commenting, as he did so that he was "permit[ing] it for what it's worth." In this case, the medical examin-

er simply provided scientific support to substantiate the extent of Correa's alcohol impairment. It was appropriate for the medical examiner, who was a forensic scientist and a medical doctor, and who had routinely performed both alcohol and drug tests in connection with autopsies, to base his opinion concerning the victim's impairment on an official reading of the test results that reflected Correa's blood-alcohol level at the time of the autopsy. The witness, who was board certified in anatomic, clinical, neuro, and forensic pathology, was undoubtedly competent to opine as he did about whether this level of alcohol resulted in any impairment of the victim during his fatal encounter with Ortiz. For these reasons, we conclude, the trial justice did not err when he permitted this expert to testify that Correa's blood-alcohol content indicated that he was impaired by alcohol when Ortiz beat him to death. This fact was highly relevant for the judge and jury to assess the credibility of defendant's story concerning his encounter with the deceased and the propriety of his actions in repeatedly striking the victim with the nail board.

### III

**Involuntary Manslaughter Instruction**

■ Lastly, defendant alleges that the trial justice erred in refusing to instruct the jury on involuntary manslaughter. He argues that "[a] question raised by the evidence presented at trial was whether [defendant] responded with more force than was necessary to repel the attack," and that, if he overreacted, those acts would amount to involuntary manslaughter. He also alleges that "[h]ad the jurors been properly instructed, they may well have concluded that [he] acted lawfully, in self-defense, but did so with criminal negligence in repelling Jose Correa's aggression by continuing to strike the deceased with the board."

At the close of the case, defendant asked the trial justice to instruct the jury on the crime of involuntary manslaughter. He did so based on two specific theories, for which, he says, some evidence existed to support the suggested charge: (1) defendant's actions consisted of disorderly conduct, which was only a misdemeanor; and (2) defendant engaged in self-defense, but did so with criminal negligence by going too far in repelling Correa's alleged attacks. The trial justice rejected the first theory advanced by defendant, explaining that, if the conduct in question did not constitute self-defense, then it amounted at a minimum to assault with a dangerous weapon, which was a felony and not merely a misdemeanor constituting disorderly conduct. The trial justice also did not accept the second theory that defendant advanced. Rather, it appeared to the court that defendant's alleged actions vis-à-vis Correa were an attempt to bring himself under the doctrine of imperfect self-defense, which Rhode Island law does not allow to reduce a charge of murder. Although the trial justice denied defendant's involuntary-manslaughter charge, he explained that:

> "I would guess that it may be possible for a person engaging in a lawful defense to kill an innocent bystander by that lawful defense and thereby become guilty of involuntary manslaughter. That is as close as I can come to recognizing that. There is potential for involuntary manslaughter under the circumstances of a lawful defense gone wrong * * *. But * * * if you want to save the objection you do have to raise it after I charge."

Thereafter, defendant properly preserved his objection for appeal.

A defendant charged with a crime "is entitled to instructions that explain those propositions of law that relate to material issues of fact that the evidence supports."[6] *State v. Fetzik*, 577 A.2d 990, 996 (R.I.1990). Thus, it is undisputed that a defendant is entitled to an instruction on a lesser-included offense when at least some evidence adduced at trial warrants such a charge. *State v. Brown*, 744 A.2d 831, 838 (R.I. 2000); *State v. Wilding*, 740 A.2d 1235, 1240 (R.I.1999); *State v. Brown*, 549 A.2d 1373, 1378 (R.I.1988). We do not require a trial justice, however, to give the jury a lesser-included-offense instruction "when the evidence presented at trial shows no dispute as to an essential element that distinguishes the greater and the lesser offenses." *Brown*, 549 A.2d at 1378. On this appeal, we examine the record to determine whether it contains sufficient evidence to warrant a jury charge on involuntary manslaughter. *See id.* (recognizing that this Court's task on appeal from a trial court's refusal to give a jury instruction on a lesser-included offense "is to examine the record to determine whether sufficient evidence was introduced at trial to warrant [the instruction]").

Involuntary manslaughter is defined in Rhode Island as an "unintentional homicide without malice aforethought, committed either in the performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence." *State v. Hockenhull*, 525 A.2d 926, 929 (R.I.1987); *State v. Kaner*, 463 A.2d 1348, 1351 (R.I. 1983). "[B]efore the trial justice is required to give an instruction on [involuntary] manslaughter, the evidence must show, however minimally, that the defendant acted without malice, either in * * * the commission of an unlawful nonfelonious act or in the performance of a lawful act with criminal negligence." *Kaner*, 463 A.2d at 1351. Involuntary manslaughter resulting "from criminal negligence is a lesser degree of homicide than an act that may constitute murder as the result of the wanton recklessness of the accused." *Hockenhull*, 525 A.2d at 929. Criminal negligence is defined as " 'conduct which is such a departure from what would be that of an ordinarily prudent or careful man [or woman] in the same circumstances as to be incompatible with a proper regard for human life, or an indifference to consequences.' " *State v. Robbio*, 526 A.2d 509, 514 (R.I.1987). Criminal negligence is negligence that is aggravated, culpable, or

---

6. General Laws 1956 § 12–17–14 provides that:

"Whenever any person is tried upon an indictment, information, or complaint and the court or jury, as the case may be, shall not be satisfied that he or she is guilty of the whole offense, but shall be satisfied that he or she is guilty of so much of the offense as shall substantially amount to an offense of a lower nature, or that the defendant did not complete the offense charged, but that he or she was guilty only of an attempt to commit the same offense, the court or jury may find him or her guilty of the lower offense or guilty of an attempt to commit the offense, as the case may be, and the court shall proceed to sentence the person for the offense of which he or she shall be so found guilty, notwithstanding that the court had not otherwise jurisdiction of the offense."

Rule 31(c) of the Superior Court Rules of Criminal Procedure provides that: "[t]he defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense."

Both the statute and the above-cited rule place a defendant on notice that all lesser-included offenses are necessarily included in the stated charge. *State v. Cipriano*, 430 A.2d 1258, 1260 (R.I.1981).

gross. *Id.* at 514 n. 2. "The word 'involuntary,' used in connection with manslaughter, characterizes the result of the act, not the doing of the act." F. Lee Bailey and Henry B. Rothblatt, *Crimes of Violence: Homicide and Assault* § 568 at 442 (1973). "It does not mean that volition was not present in the act from which the death resulted." *Id.;* see also *State v. McVay,* 47 R.I. 292, 297, 132 A. 436, 438 (1926).

■ Voluntary manslaughter, however, is defined as "an intentional homicide without malice aforethought in a sudden heat of passion as a result of adequate legal provocation." *Kaner,* 463 A.2d at 1351. "The usual view of voluntary manslaughter thus presupposes an intent to kill (or perhaps an intent to do serious injury or to engage in very reckless conduct), holding that in spite of the existence of this bad intent the circumstances may reduce the homicide to manslaughter." Wayne R. La-Fave, *Criminal Law* § 7.10(a) at 704 (3d ed.2000).

"Although the killing of another person—when accompanied by an intent to kill, or by an intent to do serious bodily injury short of death, or when resulting from such unreasonable and highly reckless conduct as to 'evince a depraved heart'—often amounts to murder, yet it may under certain circumstances amount only to voluntary manslaughter." *Id.* at 703.

"Such killings, of course, under still other circumstances (e.g., self-defense, prevention of felony) may amount to no crime whatsoever." *Id.* at 703 n. 2.

■ Thus, involuntary manslaughter occurs when, without malice aforethought, an unintentional death results from a voluntary act, one that a reasonable person, acting in a similar manner, would not expect to cause death or serious injury. *See Hockenhull,* 525 A.2d at 929; *Kaner,* 463 A.2d at 1351. Voluntary manslaughter, on the other hand, occurs when an intentional death results from a voluntary act—that is, one that a reasonable person acting in a similar manner would expect to cause death or serious injury—that occurs without malice aforethought, in the heat of passion, and is the product of adequate legal provocation. *See Hockenhull,* 525 A.2d at 929–30; *Kaner,* 463 A.2d at 1351.

■ In this case, an examination of the evidence presented at trial convinces us that the trial justice correctly denied defendant's requested instruction on involuntary manslaughter. The trial justice correctly denied defendant's first proffered theory to support an involuntary-manslaughter charge on the grounds that assault with a dangerous weapon is a felony and, thus, such conduct cannot form the basis for an involuntary-manslaughter charge. No evidence existed to support the notion that defendant had engaged in mere disorderly conduct when he cudgeled Correa to death. The trial justice denied defendant's second theory to support his request for an involuntary-manslaughter instruction, explaining that it appeared to him that, according to defendant's own explanation of what he did, his actions amounted to an honest yet unreasonably deadly manifestation of imperfect self-defense. The use of deadly force with an honest but mistaken belief that such conduct is required for self-defense is another name for the so-called doctrine of imperfect self-defense. As we explained in *State v. Catalano,* 750 A.2d 426, 429 (R.I.2000):

"[t]he doctrine of imperfect self-defense * * * purports to reduce the crime of murder to voluntary manslaughter. * * * The theory underlying the doctrine is that when a defendant uses deadly force with an honest but unreasonable belief that it is necessary to defend himself, the element of malice,

necessary for a murder conviction, is lacking."

We held both in *Catalano*, 750 A.2d at 429, and in *State v. Wright*, 558 A.2d 946, 951 (R.I.1989), that Rhode Island does not recognize the doctrine of imperfect self-defense in response to a charge of murder.[7] The theory of imperfect self-defense does not entitle defendant to an involuntary-manslaughter jury instruction because a "killing committed in self-defense is, nevertheless, an intentional killing." *United States v. Skinner*, 667 F.2d 1306, 1310 (9th Cir.1982); LaFave, § 7.11(a) at 718 n. 6.

The defendant testified that he repeatedly struck Correa in the head with a board containing protruding nails after Correa initially attacked him with the board. He admitted that he hit Correa again and again with the nail board after Correa tried to grab him and pull him down after he started to walk away. The defendant admitted that, even when Correa was on the ground, he hit him yet again with the board, as Correa was trying to get up. The medical examiner testified that Correa suffered approximately thirty lacerations, contusions, and abrasions from these blows. He estimated that these injuries probably resulted from between four and fifteen different blows from the nail board. He also opined that Correa died from brain injuries and skull fractures caused by blunt-force trauma. Nevertheless, defendant in this case alleged that an involuntary-manslaughter instruction was

warranted because his actions amounted to self-defense and he did not intend to kill Correa.

The defendant's alleged actions in this case were similar in theory to those described in *State v. Ventre*, 811 A.2d 1178, 1181, 1184 (R.I.2002). In *Ventre*, this Court held that the trial justice should have provided a voluntary-manslaughter instruction, such as the one that the trial justice gave in this case. *Id.* at 1184. In *Ventre*, the defendant fired his weapon three times, killing one of his four assailants and injuring another. *Id.* at 1181, 1184. Although the defendant in *Ventre* explained that he did not know that, as a result of his actions, one of his assailants had died, he purposefully and voluntarily retrieved his gun from his car and fired at his four attackers. *See id.* at 1181. In *Ventre*, the defendant's alleged actions were voluntary: in shooting at the four men in the manner that he did, he necessarily must have intended to kill or to wound them grievously, albeit he asserted he did so only in self-defense. *See id.* In this case, defendant's actions also were voluntary; he continuously and purposefully battered Correa with the nail board, thereby intending by his conduct to kill or to inflict serious injury on Correa. In *Ventre* and in this case, both defendants, by their conduct, acted in a manner that would tend to kill or, at the very least, to cause serious bodily injury to their victims. LaFave, § 7.10(a) at 704. Their asserted

---

**7.** The defendant urges this Court to adopt the reasoning of some courts in other jurisdictions that a defendant's misperception of a threat reduces a charge of homicide to involuntary manslaughter because the defendant acted in self-defense, but in an unlawful or excessive manner. The defendant cites the following cases as support for this proposition: *People v. Blakeley*, 23 Cal.4th 82, 96 Cal.Rptr.2d 451, 999 P.2d 675 (2000); *People v. Welch*, 137 Cal.App.3d 834, 187 Cal.Rptr. 511 (1982); *State v. Atwood*, 105 Idaho 315, 669 P.2d 204 (1983); *State v. Scobee*, 242 Kan. 421, 748 P.2d 862 (1988); and *State v. Williams*, 6 Kan.App.2d 833, 635 P.2d 1274 (1981). But these cases are neither binding on this Court, nor persuasive in light of *State v. Catalano*, 750 A.2d 426, 429 (R.I.2000), and *State v. Wright*, 558 A.2d 946, 951 (R.I.1989), both of which rejected the doctrine of imperfect self-defense as a means to reduce a charge of murder to manslaughter.

conduct, if the fact-finder were to believe their testimony, entitled them to a jury instruction on self-defense and on voluntary manslaughter, but it did not warrant an involuntary-manslaughter instruction.

In this case, if defendant's version of what happened were creditable and if his acts did not constitute self-defense, then his conduct could fit within the voluntary-manslaughter definition: "an intentional homicide without malice aforethought in a sudden heat of passion as a result of adequate legal provocation." *Kaner*, 463 A.2d at 1351. Among the instructions the jurors received were: self-defense, voluntary manslaughter, and murder in the second degree. But the jury returned a verdict of second-degree murder and not of voluntary manslaughter. It also rejected defendant's suggestion of self-defense when it failed to acquit him. As the trial justice said, if defendant had entertained an honestly mistaken belief that lethal force was necessary to defend himself, then defendant would not be guilty of any crime, including criminally negligent involuntary manslaughter. Thus, the trial justice properly gave the self-defense instruction to the jury and not an involuntary-manslaughter charge. And because malice could be inferred from defendant's actions, the trial justice properly instructed the jury on second-degree murder, as well as on self-defense and voluntary manslaughter.

This case is also distinguishable from *Robbio*, 526 A.2d at 513–14, in which we affirmed a judgment of conviction for involuntary manslaughter after a father killed his daughter as he was "dry-firing" a loaded handgun. In *Robbio*, even though the defendant intentionally and voluntarily was "dry-firing" his weapon, he did not intend thereby to kill his daughter or anyone else. *Id.* In that case, there was an intentional and voluntary action ("dry-fir-

ing" a weapon), but the resulting consequences of this action, the death of his daughter, were unintentional because the defendant did not intend by his conduct to kill, injure, or harm his child.

In this case, however, defendant's actions obviously were intended to harm Correa, if not to kill him. According to his own testimony, Ortiz acted purposefully by prying away Correa's nail board from him and then attacking him with it. Although he explained that his actions were not intended to kill Correa, nevertheless, at the time of the fatal encounter, he had to have known that repeatedly striking Correa in the head with the nail board would, at the very least, cause him serious bodily harm. Indeed, the evidence revealed that the victim suffered approximately thirty different lacerations, abrasions, and contusions from this brutal beating. Thus, there was nothing unintentional about defendant's actions; he purposefully pummeled Correa with the nail board with the apparent intent to kill or to maim him. Having beaten Correa to a bloody pulp—to the point at which his body was unidentifiable without the help of a thumbprint—it ill lies in defendant's mouth to suggest that he had no intention to kill the victim. Neither his actions nor the predictable results of his actions properly warranted a charge of involuntary manslaughter.

Just as in our other cases in which we addressed this issue, *see Wilding*, 740 A.2d at 1240–41 (affirming a denial of an involuntary manslaughter instruction because the trial record lacked sufficient evidence to infer any nonmalicious or negligent act on the part of the defendant, but rather the totality of the evidence indicated that the defendant forcibly struck an infant six times); *State v. Clark*, 423 A.2d 1151, 1160 (R.I.1980) (explaining that the defendant was not entitled to an involuntary manslaughter instruction because his testimo-

ny precluded any inference that his co-inmate's death resulted from an unintentional stabbing), and *Kaner*, 463 A.2d at 1351 (holding that the defendant was not entitled to either an involuntary or a voluntary manslaughter charge because the severe and brutal beating of his uncle could not be found to be unintentional based on the fair reading of the record), the denial of the involuntary manslaughter instruction was proper in this case. It was clear from the evidence presented at trial and from the defendant's own testimony that Correa's death was not the product of an unintentional killing.

We therefore conclude that the trial justice committed no error in refusing to charge the jury in accordance with the defendant's requested involuntary-manslaughter instruction.

### Conclusion

Thus, we deny the defendant's appeal and affirm the conviction.

Justice FLAHERTY did not participate.