May 7, 2026

**Supreme Court**

No. 2024-264-C.A.
(P1/22-53AG)

State                           :

      v.                        :

Miguel Lacourt.                 :


NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                               :

Miguel Lacourt.                    :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

# O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Miguel Lacourt, appeals from a May 24, 2024 judgment of conviction and commitment on one count of second-degree murder, one count of discharging a firearm while committing a crime of violence, and one count of carrying a firearm without a license.  Those convictions were the result of a jury trial held in the Providence County Superior Court.

On appeal, defendant contends that the trial justice erred in not instructing the jury on the lesser-included offense of voluntary manslaughter "when there was more than minimal evidence of adequate provocation and that [defendant] acted in the heat of passion."

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

- 1 -

# I

## Facts and Travel

The criminal prosecution giving rise to this appeal arose from fatal shootings that took place in the immediate vicinity of West Friendship Street in Providence, Rhode Island, in the early morning hours of August 7, 2021. The shootings resulted in the tragic deaths of Kenwins Pimental and Mario Diaz.

On January 5, 2022, a grand jury indicted defendant on two counts of first-degree murder (Count 1 and Count 3); two counts of discharging a firearm while committing a crime of violence (Count 2 and Count 4); and one count of carrying a firearm without a license (Count 5).

A six-day jury trial commenced on January 5, 2024. On January 17, 2024, defendant was convicted by the jury of the second-degree murder of Mr. Diaz (Count 3). He was also convicted of one count of discharging a firearm while committing a crime of violence (Count 4) and one count of carrying a firearm without a license (Count 5).[1]

On January 22, 2024, defendant filed a motion for a new trial. The trial justice denied defendant's motion after a hearing on February 9, 2024. Later, on April 22,

---

[1] As will be further discussed *infra*, the jury acquitted defendant on both the count accusing him of the murder of Mr. Pimental (Count 1) and the count of discharging a firearm while committing a crime of violence in connection with Mr. Pimental's death (Count 2).

2024, defendant received a sixty-year sentence, a consecutive life sentence, and a concurrent ten-year sentence. A judgment of conviction and commitment was entered on May 24, 2024. The defendant had filed a premature but valid notice of appeal on April 24, 2024.

**A**

**The Trial**

At trial, defendant took the stand in his own defense. We recite below his testimony as it relates to the issue on appeal.

The defendant testified that, on the evening of August 6, 2021, he was with his friend, Michael Cotto, along with Mr. Cotto's nephew, Geovanny Marquis,[2] to celebrate Mr. Cotto's birthday. The defendant testified that he arrived at the "Fuego club" around midnight. He added that, after he arrived at the club and was "walking to the back to the VIP," he felt a "presence" and noticed Jonathan Peguero staring at him.

According to defendant, he was trying to stay away from Mr. Peguero. He stated that Mr. Peguero had previously been in a relationship with a female acquaintance of defendant, one Michell Aruso, but that that relationship "went sour." The defendant added that, because the relationship between Mr. Peguero and Ms.

---

[2]     The record contains different spellings of Geovanny Marquis' last name. For the sake of consistency, we have utilized the spelling used in the trial transcripts.

- 3 -

Aruso had soured, he invited Ms. Aruso to stay at his apartment.  The defendant testified that, as a result of his contact with Ms. Aruso, he "tried to stay * * * away from" Mr. Peguero when they were inside the Fuego club.

According to defendant, he, along with Mr. Cotto and Mr. Marquis, left the club at approximately 2:02 a.m.  He added that, shortly after leaving the club, he was approached by Mr. Peguero, who angrily stated: "You are f****** with my girl.  We need to talk.  Come take this walk."  The defendant testified that he was nervous because he understood Mr. Peguero's statement to mean "let's go fight."  He further stated that, as he walked with Mr. Peguero, he noticed two men approaching them, one of whom was Mr. Diaz (one of the eventual victims).

The defendant noted that Mr. Peguero began arguing with Mr. Cotto; he said that, shortly thereafter, Mr. Marquis (Mr. Cotto's nephew) punched Mr. Peguero.[3] The defendant added that Mr. Peguero then began "beating on [Mr. Marquis]," which prompted defendant to "jump[] into the situation."  He described "grabb[ing Mr. Peguero]" and "put[ting] him around the car" before getting "sucker punched" by Mr. Diaz.  The defendant recalled that, after that punch, he fell to the ground and was pulled by his hair while being punched and kicked.  It was defendant's testimony

---

[3]      Throughout the course of defendant's testimony, there were numerous references to video surveillance footage that had been admitted into evidence at trial. In particular, defendant testified with reference to video surveillance footage from outside the Fuego club.

that one of the men beating him fell to the ground and "tried stabbing [him] to death" with a knife. According to defendant, the knife made contact with his right finger. He further noted that, during the altercation, he lost his hat and a sneaker and that a "dread [was] ripped out of [his] head." The defendant stated that, while he was on the ground being beaten, he heard an individual say: "I'm going to f***** kill you."

The defendant testified that, at some point, he was able to stand up from the ground and depart from the scene, leaving Mr. Cotto and Mr. Marquis behind. He added that, while the fight was still ongoing, he ran to his car, which was "[w]ay up the street," in order to "to grab [a] gun" because he believed that he needed it to protect his friends and himself. When questioned as to what his state of mind was at that point in time, defendant responded that, because he knew one of the men had a knife, he wanted to "come back to make sure * * * my friends [weren't] going to die. I was trying to protect them."

The defendant testified that, when he returned from retrieving the firearm from his car, he noticed Mr. Pimental (one of the eventual victims) raising his right arm and "pointing his gun at [him]." He further noted that he knew it was a gun because Mr. Pimental fired the gun and he "heard the shot go off." The defendant additionally stated that it was his belief that Mr. Diaz "was the one that stabbed [him], so [he was] looking at the situation like [Mr. Diaz was] going to strike them with a knife." The defendant testified that, after Mr. Pimental had fired the gun,

defendant shot three times at Mr. Diaz. It was further his testimony that, after shooting at Mr. Diaz, he fired two shots at Mr. Pimental. The defendant stated that, at that point in time, Mr. Pimental's back was turned and he was reaching for his gun again. He added that, at that moment, they both said to each other: "Don't do it." The defendant testified that neither of them further fired their guns and that he proceeded to leave.

According to defendant, after he left the scene of the fight, he again went back to his car and got into the driver's seat. He stated that Mr. Cotto then opened the passenger door and threw a gun on the passenger seat, saying: "Get rid of it." The defendant testified that the gun that Mr. Cotto threw on the seat was not defendant's gun. The defendant further stated that he drove off and that, when he was home, he learned that there was a call waiting from Mr. Cotto. He testified that, on the phone call, Mr. Cotto said to him: "You shot one and I shot one." The defendant stated that, in response to Mr. Cotto's statement, he asked Mr. Cotto: "What the f*** happened? How did you get the gun?" He said that Mr. Cotto responded: "I wrestled with him and I shot him."

**B**

**The Jury Instructions and the Jury Verdict**

Prior to instructing the jury, the trial justice held a chambers conference, during which he heard arguments concerning defendant's request for a voluntary

manslaughter instruction. The defendant contended that the jury could find that, because Mr. Pimental raised his right arm while pointing a gun at him, he responded in the heat of the moment to that action by firing first at Mr. Diaz and then immediately at Mr. Pimental because he was in fear. The state disagreed, arguing that the fact that defendant shot first at Mr. Diaz—who was not the individual who fired the gun at defendant—negated the heat of passion element required for a voluntary manslaughter instruction.

During the chambers conference, in addressing the request for a voluntary manslaughter instruction, the trial justice noted that defendant had armed himself with a loaded gun after breaking away from the fight and before returning to the scene. He further stated that, based on the video surveillance footage, it did not appear that Mr. Diaz was assaulting defendant's friends. For these reasons, the trial justice ruled that he would not give a voluntary manslaughter instruction.

After so ruling, the trial justice proceeded to instruct the jury. During the trial justice's final instructions, he informed the jury that defendant could not "claim self-defense regarding the Pimental killing" because defendant denied that he had killed Mr. Pimental. (It was defendant's position that someone else was responsible for that homicide.) Turning to Mr. Diaz's death, the trial justice informed the jury that defendant admitted to shooting Mr. Diaz but claimed that he was justified in shooting "to protect his friends from imminent death or serious bodily harm." The

trial justice noted that "[t]hat claim is based on a theory of law known as the defense of another, which is related to the law of self-defense." Following that explanation, the trial justice explained the law relative to self-defense in the context of the defense of another contention.

On January 17, 2024, the jury acquitted defendant of the count accusing him of first-degree murder of Mr. Pimental (Count 1) and of the count of discharging a firearm while committing a crime of violence (*viz.*, the shooting of Mr. Pimental) (Count 2). The jury found defendant guilty of the remaining counts—*viz.*, one count of second-degree murder of Mr. Diaz (Count 3), one count of discharging a firearm while committing a crime of violence (Count 4), and one count of carrying a firearm without a license (Count 5).

## C

### The Motion for a New Trial

On January 22, 2024, defendant filed a motion for a new trial on Count 3 and Count 4 pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. The defendant asserted (1) that the "jury did not render a verdict based on the weight of the evidence;" and (2) that the "jury's verdict reflects unreasonable inferences and as such the jury misapplied the law to the facts." The defendant contended that an instruction on voluntary manslaughter was warranted because the testimony established that defendant "responded in the heat of the moment after provocation

- 8 -

* * *." The defendant emphasized that the trial testimony indicated that he had been beaten up and that, when he returned to the scene after retrieving the gun from his car, Mr. Pimental pointed a gun and fired at least one shot in his direction. The defendant additionally noted that, because the jury found defendant guilty of second-degree murder and not first-degree murder, it follows that the jury did not "accept the State's theory of the case that he left, got his gun with the intent to kill, and returned two minutes later."

The state filed an objection to defendant's motion for a new trial on February 7, 2024. The state asserted that the video surveillance footage admitted at trial established that Mr. Pimental never had a gun and did not fire a gun. It noted that people near the scene where the fight was taking place reacted only when defendant's gun was fired. The state additionally stated that the evidence revealed that, when defendant arrived back at the scene, "[n]o punches were being thrown, no weapons were displayed, no active fighting was occurring." The state also argued that, even if one were to believe defendant's theory that Mr. Pimental raised his right arm while holding a gun, "nothing Mr. Diaz did would have caused any fear on the part of the defendant."

A hearing on defendant's motion for a new trial was held on February 9, 2024. After referring to the relevant case law, the trial justice indicated that he remained firmly of the opinion that the facts did not call for a voluntary manslaughter

instruction. He noted that, when defendant was able to "escape" the beating he had received, he left the scene and went a block away to his vehicle, from which he retrieved a loaded firearm. The trial justice added that, while defendant testified that he returned to the scene to assist and protect friends who he thought could still have been in harm's way, it did not appear "from the video that [defendant] was hurrying back to assist his friends." He also emphasized that the video surveillance footage showed that, when defendant arrived back on the scene:

> "[A] bit of a scuffle was in progress, if it can ever be called a scuffle, as it amounted to a little more than some shoving and pushing. Certainly, it was not a full-blown melee in which [defendant] was initially involved. No weapon was seen on the video and no significant altercation was seen on the video."

Additionally, the trial justice referenced the fact that Mr. Diaz had not been involved in the initial altercation and that he was "simply an idle onlooker" who displayed no threatening gestures. He added that shooting Mr. Diaz was "unquestionably [an] act of malice," particularly because Mr. Diaz was first shot at point-blank range and was then shot "in his back as he desperately tried to avoid further harm * * *." According to the trial justice, if defendant was adequately provoked as he claimed he was, the provocation was prompted by Mr. Pimental allegedly firing his gun at defendant.

Turning to the shooting of Mr. Pimental, the trial justice first noted that Mr. Pimental was holding a cell phone and was filming the events before he "raised an

- 10 -

arm and according to [defendant], but not at all apparent on the video, allegedly fired shots in [defendant's] direction, and he then retreated down the sidewalk from where he had come." The trial justice later stated that he found that Mr. Pimental did not fire any shots and that, on the basis of the video surveillance footage, he could not "see anything in his hands except his lit-up cell phone, much less a gun." The trial justice added that he agreed with the state's position that surrounding bystanders did not display any type of reaction until defendant fired his gun. He also rejected defendant's position that there was adequate provocation resulting from defendant's becoming fearful of Mr. Pimental's shooting at him, which caused him to misdirect shots at Mr. Diaz instead of Mr. Pimental, who was not in the immediate vicinity of Mr. Diaz. The trial justice further stated that defendant did not return to the scene with the intent to protect his friends; rather, it was the trial justice's opinion that defendant's motive upon return was "prompted by and born of wounded pride and an intent to get even; to retaliate and avenge his beating."

The trial justice concluded that, in addition to his previous statements, he believed that there was "much other evidence of [defendant's] guilt to find him guilty of murdering [Mr.] Diaz." He further found no reason to question the jury's verdict to convict defendant of second-degree murder in this case. For those reasons, the trial justice denied defendant's motion for a new trial.

## D

## The Subsequent Travel of the Case

On April 22, 2024, defendant was sentenced to: a sixty-year sentence on the murder count (Count 3); a consecutive life sentence on the count alleging the discharge of a firearm while committing a crime of violence (Count 4); and a concurrent ten-year sentence on the count alleging the carrying of a firearm without a license (Count 5).

A judgment of conviction and commitment was entered on May 24, 2024. The defendant filed a premature but valid notice of appeal on April 24, 2024.

## II

## Issue on Appeal

The defendant argues on appeal that the trial justice erred in refusing to instruct the jury on the lesser-included offense of voluntary manslaughter "when there was more than minimal evidence of adequate provocation and that [defendant] acted in the heat of passion."

## III

## Standard of Review

This Court has made it clear that "a trial justice's refusal to instruct the jury on a lesser-included offense is reviewed by this Court on a *de novo* basis." *State v. Motyka*, 893 A.2d 267, 281 (R.I. 2006). When we conduct such a review, we

"examine the record in the case and determine whether the evidence justifies such an instruction." *Id.*; *see State v. Garcia*, 883 A.2d 1131, 1137 (R.I. 2005) ("In determining whether the refusal to instruct on a lesser-included offense was proper, this Court examines the record to determine whether adequate evidence was introduced to merit a jury instruction on the lesser-included offense."). We have stated that "the role of this Court is limited to ascertaining whether an actual and adequate dispute exists as to the distinguishing element between the lesser and greater offenses in question." *Motyka*, 893 A.2d at 281 (internal quotation marks omitted). This Court has further stated that it will "uphold [challenged jury instructions] when they adequately cover the law." *State v. Delestre*, 35 A.3d 886, 891 (R.I. 2012) (internal quotation marks omitted). When conducting our review, we examine the record in the light most favorable to the defendant. *See State v. Soler*, 140 A.3d 755, 759-60 (R.I. 2016).

## IV

## Analysis

On appeal, defendant contends that the trial justice erred "when he refused to instruct the jury on the lesser-included offense of voluntary manslaughter when there was more than 'minimal evidence' to support it." The defendant asserts that, because the jury charge failed to adequately cover the law, reversal of his conviction is necessary.

In particular, defendant states that he satisfied the element of adequate provocation in that the evidence showed that he had a reasonable fear of death or serious bodily harm. Specifically, defendant claims: (1) that he was first attacked by assailants who punched and kicked him and also ripped out some of his hair; (2) that he was attacked by someone with a knife; and (3) that he heard someone state: "I'm going to f****** kill you." Additionally, it is defendant's position that the evidence further established that he acted in the heat of passion. He emphasizes his testimony that, when he broke free from the assailants, he ran to retrieve his gun because he believed that his friends were still being attacked. The defendant adds that, when he returned to the scene with his gun, Mr. Pimental fired his gun at him, which caused defendant to instantly fire his own gun in rapid succession at both Mr. Diaz and Mr. Pimental because he was overcome by fear. In addition, defendant contends that his testimony showed that he believed that Mr. Diaz was the individual who had attacked him with the knife. The defendant further cites to this Court's holdings in *State v. Esdel*, 317 A.3d 756 (R.I. 2024), and *State v. Ventre*, 811 A.2d 1178 (R.I. 2002), as being supportive of his position that a voluntary manslaughter instruction should have been given.

For its part, the state counters by noting that defendant did not testify that Mr. Diaz "assaulted him or anyone else before he shot him." The state further posits that the factual situation of this case is more akin to that at issue in *State v. McGuy*, 841

- 14 -

A.2d 1109 (R.I. 2003), than it is to the cases cited by defendant (*viz.*, *Esdel* and *Ventre*). Additionally, the state argues that the instant case would only have some resemblance to the cases cited by defendant

> "if defendant had drawn and fired a weapon during the immediacy and urgency of the initial attack, if he had only fired a single warning shot, or if he had requested the instruction for killing the man he claimed, and must be presumed, was actually firing a weapon at him – not someone else."

It is well established that "[v]oluntary manslaughter is a lesser-included offense to a charge of murder." *McGuy*, 841 A.2d at 1112. This Court has made clear that voluntary manslaughter is an "intentional homicide that does not include the element of malice aforethought by reason of one or more mitigating factors." *Ventre*, 811 A.2d at 1184; *see State v. Ortiz*, 824 A.2d 473, 486 (R.I. 2003). Simply put, the distinguishing factor between voluntary manslaughter and murder is malice. *See Esdel*, 317 A.3d at 766.

As noted, voluntary manslaughter requires the existence of mitigating factors such as the heat of passion that arises as a result of adequate provocation. *See Ventre*, 811 A.2d at 1184; *Ortiz*, 824 A.2d at 486. "Adequate provocation arises, *inter alia*, when the defendant reasonably fears imminent death or serious bodily harm." *State v. Ruffner*, 911 A.2d 680, 686 (R.I. 2006). The element of heat of passion is present "when the defendant suddenly and temporarily loses his self-control as a result of

- 15 -

experiencing some overpowering emotion—such as extreme fear, terror, or anger—caused by a legally adequate provocation, such as being attacked by someone wielding a deadly weapon." *McGuy*, 841 A.2d at 1114. Thus, this Court has held that "voluntary manslaughter exists when (1) the provocation is so gross as to cause the ordinary reasonable [person] to lose his or her self control and to use violence with fatal results, and (2) the defendant is deprived of his self control under the stress of such provocation and committed the crime while so deprived." *Id.* at 1113 (internal quotation marks, brackets, and deletions omitted).

This Court has previously stated that "[i]n determining whether the evidence calls for a lesser-included-offense instruction, the trial justice should not weigh the credibility of the testimony; rather, he or she should consider whether, at the very least, some minimal evidence exists that, if credited by the jury, could support a conviction for the lesser-included offense." *McGuy*, 841 A.2d at 1112. However, the trial justice is not required to instruct the jury on a lesser-included offense when the evidence completely fails to support such a charge. *Id.*; *see Esdel*, 317 A.3d at 766. If a defendant is charged with murder, he or she "is entitled to a voluntary-manslaughter instruction when the defendant produces some evidence from which a rational jury could conclude that he or she killed the victim without malice aforethought, in the heat of a sudden passion, and in response to a legally adequate provocation." *McGuy*, 841 A.2d at 1112. We have noted that "[c]ourts

should apply an objective standard to determine whether an alleged provocation is legally sufficient to warrant an instruction on voluntary manslaughter." *Esdel*, 317 A.3d at 767 (internal quotation marks omitted).

Here, we are in agreement with the trial justice that defendant failed to introduce sufficient evidence to show that Mr. Diaz's conduct was "so gross" as to cause an ordinary reasonable person to lose his self-control such that it results in the fatal use of a firearm. The evidence further fails to show that defendant became so distressed and terrified that, in the heat of passion, he lost his self-control and engaged in the deadly use of force that resulted in the death of Mr. Diaz.

As it relates to adequate provocation, defendant emphasizes that, before he fatally shot Mr. Diaz, he had been "attacked by multiple assailants who forced him onto the ground, ripped out one of his dreadlocks, and attacked him with their fists and boots." Additionally, he believed that Mr. Diaz had attacked him with a knife and that one of the assailants had told him: "I'm going to f****** kill you." Although we give due consideration to defendant's testimony that there had been conduct that gave him cause to fear for the safety of his friends, he has not presented minimal evidence to establish that Mr. Diaz's conduct was sufficiently threatening as to allow defendant to use lethal force directed at him.

We first note that defendant's argument fails to take into account the fact that, *after* being able to break away from the fight, he went "[w]ay up the street" to

retrieve a gun from his car. This lapse of time between the initial altercation and defendant's return to the scene should have provided for adequate time for him to cool off before fatally shooting Mr. Diaz. *See McGuy*, 841 A.2d at 1114; *State v. Infantolino*, 116 R.I. 303, 307-08, 355 A.2d 722, 725 (1976). The defendant's testimony also suggested that, when he returned to the scene after retrieving his gun from his car, only Mr. Pimental was in possession of a gun. There is no evidence that, when defendant returned to the scene of the altercation, Mr. Diaz specifically tried to attack defendant's friends, pointed a dangerous object such as a knife or gun at them, or even threatened to use a dangerous object against them. *See McGuy*, 841 A.2d at 1113. Simply put, the evidence is insufficient to show that defendant reasonably perceived that his friends were under attack and that deadly force in a potentially lethal manner was being used against them by Mr. Diaz.

Similarly, defendant has not produced minimally sufficient evidence to demonstrate that "the killing occurred during the heat of some sudden and uncontrollable passion." *McGuy*, 841 A.2d at 1114. The defendant asserts that, when he returned to the scene of the fight, Mr. Pimental pointed and fired a gun at him, causing him to be overcome by fear, which resulted in the instantaneous firing of his own gun at Mr. Diaz. As noted above, the evidence only suggests that, when he returned to the fight with a gun, Mr. Pimental—*not* Mr. Diaz—shot at defendant and/or his friends when defendant fired his fatal shots at Mr. Diaz. The evidence

- 18 -

therefore does not show that Mr. Diaz's conduct caused defendant to lose his self-control.

In view of our reasoning set forth in the immediately preceding paragraph of this opinion, it is our judgment that defendant's reliance upon *State v. Esdel*, 317 A.3d 756 (R.I. 2024), and *State v. Ventre*, 811 A.2d 1178 (R.I. 2002), is misplaced. In both of those cases, the respective defendants presented minimal evidence that the decedents themselves posed an immediate mortal threat to which each of the defendants almost instantaneously reacted by using deadly force. *See Esdel*, 317 A.3d at 768, 769; *Ventre*, 811 A.2d at 1181, 1184.

In *Esdel*, the victim of the shooting approached the defendant while he was seated in his vehicle, which at the pertinent point in time was completely surrounded, and the victim was "wearing a ski mask, carrying a pistol, and making verbal threats * * *." *Esdel*, 317 A.3d at 768. The defendant in that case testified that, almost instantly, "he responded to these life-threatening circumstances by raising his right arm and letting off a single shot through his passenger window." *Id.* This Court held that, based on the facts of that case, there was "more than minimal evidence placed before the jury to support a conviction for voluntary manslaughter." *Id.* at 769 (emphasis omitted). We reasoned that the evidence presented by defendant in *Esdel* that he "was in fear for his life coupled with how quickly [the] events transpired, and the decedent's prior hostile history with defendant—who was known to carry a

firearm—are factors that could lead defendant to fire the weapon in the heat of passion on sudden provocation." *Id.*

In a similar fashion, this Court held in *Ventre* that the "defendant's testimony provided an adequate basis for a claim that defendant was faced with a brutal attack, which placed him in fear of death or serious bodily harm." *Ventre*, 811 A.2d at 1184. In that case, the defendant testified that he was attacked by four assailants who engaged in "beating and pummeling" him. *Id.* at 1181. The defendant provided testimony that, "as he was struck and pummeled by his assailants," he was unable to try to escape as he had been "impaired from a prior accident that resulted in a rod being placed in one of his legs." *Id.*

It is clear that the facts of both *Esdel* and *Ventre* are readily distinguishable from those in the case at bar, where there is lacking minimal evidence upon which a jury verdict of voluntary manslaughter could be based when defendant's testimony is considered in its entirety. *See Garcia*, 883 A.2d at 1137.

Accordingly, for the reasons discussed herein, it is our view that the trial justice did not err in declining to instruct the jury on voluntary manslaughter.

## V

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.

Justice Goldberg participated in the decision, but she retired prior to its publication.



## STATE OF RHODE ISLAND

### SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Miguel Lacourt. |
| **Case Number** | No. 2024-264-C.A. (P1/22-53AG) |
| **Date Opinion Filed** | May 7, 2026 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of Attorney General |
| | For Defendant:<br><br>Michael Graham Ewart<br>Rhode Island Public Defender |